**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GEIS CONSTRUCTION SOUTH, LLC, | ) |
| Plaintiff, | ) CIVIL ACTION NO. _____ |
| v. | ) **JURY TRIAL DEMANDED** |
| JAIME DELAHUNT, | ) |
| Defendant. | ) |

**COMPLAINT**

Plaintiff Geis Construction South, LLC ("Geis" or "Plaintiff"), by and through its attorneys Kaufman Dolowich Voluck LLP, brings this Complaint against Defendant Jaime Delahunt ("Delahunt" or "Defendant") and respectfully states as follows:

**PARTIES**

1. Geis is an Ohio limited liability company. Geis's sole member is Geis Construction, Inc., which is an Ohio corporation with its principal place of business at 10020 Aurora-Hudson Road, Streetsboro, OH 44241.

2. Defendant Delahunt is a citizen of New York who resides in Nassau County, New York at, upon information and belief, 5 Stone Road, Plainview, NY 11803.

**JURISDICTION AND VENUE**

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00 (exclusive of interest and costs).

4. This Court has personal jurisdiction over Delahunt because Delahunt is a citizen of New York.

5. Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because Delahunt is a resident of Nassau County, New York, within the Eastern District of New York.

## FACTS

6. Geis sought to do work on the Wonder Lofts Project at 720 Clinton Street in Hoboken, New Jersey 07030 (the "Project"), and Geis needed a concrete subcontractor for the Project.

7. Geis was introduced to Jaime Delahunt and Delahunt's company. It was only after the Prime Contract was awarded that Geis learned that Delahunt's company was actually named MDC Home Improvements, Inc. ("MDC").

8. Delahunt is the president of MDC. Upon information and belief, Delahunt is also the sole owner and/or employee of MDC.

### MDC Had to Provide a Bond Letter As a Condition of the Subcontracts

9. As part of its due diligence prior to selecting MDC, Geis inspected work that Delahunt represented that his company and his company's equipment was performing on a housing development in Long Island. It was discovered later that, rather than being MDC manpower and equipment that was working on this housing development, this work was in fact subcontracted by MDC to a labor supplier.

10. Under Geis's Prime Contract with the Owner for the Project, a payment and performance bond was not required of a subcontractor "in the event that a surety reasonably approved by the Owner's lender provides a surety letter demonstrating the bonding capacity of [the subcontractor]":

> 9.1.7 Surety Bonds:
>
> Under the Construction Manager's Prime Contract with the Owner, the term "Major Subcontractors" is defined to mean all mechanical, electrical and plumbing subcontractors, and all subcontractors who will receive in excess of $2,000,000 for their Work on the Project. The Prime Contract also provides that a payment and performance bond shall not be required of a "Major Subcontractor" in the event that a surety reasonably approved by the Owner's Lender provides a surety letter demonstrating the bonding capacity of a "Major Subcontractor" and such bonding capacity is deemed satisfactory by the Owner's Lender in the Lender's reasonable discretion.
>
> In the event that the Trade Contractor does not meet the definition of a "Major Subcontractor" under the Prime Contract as set forth above, no bonding shall be required and this Section 9.1.7 shall not apply to the Trade Contractor or this Agreement.
>
> If, however, the Trade Contractor hereunder (i) is a "Major Subcontractor" as above defined, (ii) the Owner's Lender is not satisfied with the required surety submission and (iii) requires the Trade Contractor to post a payment and performance bond, then, and in that event, the Trade Contractor shall post Payment and Performance Bonds relating to the Work in the full amount of the Trade Contract Sum set forth in Section 4.1 above, and which Bonds shall name the Borrower/Owner, the Construction Manager, the Township of West Orange and Owner's Lender as dual/multiple obligees.

11. Geis shared this requirement with MDC and Delahunt and requested a bond availability letter.

12. Delahunt owed Geis a duty to provide accurate information with respect to the bond availability letter and to not misrepresent a fact forming the basis of a subcontract.

13. In response, Delahunt handed Geis's Kevin Watts a June 14, 2019 letter at Geis's offices in Hackensack, New Jersey that purported to be from Sean P. Flaherty at Edwards & Company Insurance in Sayville, New York, addressed to Geis:

> Please accept this letter as verification that MDC HI Inc. has a Surety Bond Program with a $10,000,000.00 aggregate limit procured through Edwards & Company Insurance Brokerage placed with Liberty Mutual.
>
> There are currently no open bonds outstanding at this time. 2018 tax returns and current interim financials have been reviewed as of June 1, 2019 and this program is active.
>
> If you should have any questions please feel free to contact me. I look forward to continuing a long and prosperous business relationship with Mr. Delahunt and his organization.

3

Respectfully,

Sean P. Flaherty, CRIS.

See June 14, 2019 Letter from Sean P. Flaherty to Geis ("Flaherty Letter"), attached hereto as **Exhibit A**.

14. Geis reasonably relied upon this Flaherty Letter in agreeing to award a subcontract to MDC. Without either the Flaherty Letter or a payment and performance bond from MDC, Geis would not have awarded a subcontract to MDC. The Flaherty Letter was so important to Geis that the Flaherty Letter was attached to the subcontract agreement.

15. Jamie Delahunt, as President of MDC, gained a benefit by contracting with Geis.

16. On approximately June 20, 2019, Geis signed a subcontract agreement with MDC in connection with the Project for the contract, masonry and earthworks scope of work. The subcontract was signed by Delahunt as President of MDC. See June 20, 2019 Geis-MDC Subcontract, attached as **Exhibit B**.

17. On approximately October 22, 2019, Geis signed a second subcontract agreement with MDC in connection with the Project for the masonry and brick repair scope of work. The second subcontract was signed by Delahunt as President of MDC. See October 22, 2019 Geis-MDC Subcontract, attached hereto as **Exhibit C**. Collectively, the June 20, 2019 and October 22, 2019 subcontracts are referred to as the "Subcontracts."

18. Geis included the Flaherty Letter as part of the Subcontracts in connection with the Project.

**Geis Paid MDC As Required under the Subcontracts**

19. From the beginning, Delahunt wanted Geis to advance cash to MDC, even before Geis was paid by the owner, as is a condition to payment under the Subcontract. Geis tried to work with Delahunt and MDC.

20. MDC demanded that Geis pay a $250,000.00 project mobilization fee to MDC when it came to the Project, but before any work was performed. Geis paid this fee.

21. Furthermore, after Delahunt indicated he would need help meeting payroll, Geis agreed to "float" payments to MDC, paying MDC every two weeks and ahead of when Geis was paid by the Owner.

22. At this point, Delahunt was still representing to Geis that the manpower was from MDC, whereas in fact MDC subcontracted the labor out, and the only payroll MDC had to cover was that of Delahunt. Had Geis known this, it would have required lower tier lien waivers from the subcontractors.

23. Geis made these payments to keep MDC working, and with the expectation that MDC was following its Subcontract obligation to pay MDC's lower tier subcontractors, laborers, and suppliers.

24. Geis went above and beyond Subcontracts' requirements to pay MDC.

25. Delahunt represented to Geis that MDC was using the payments for Project-related costs.

**Delahunt Signed Sworn Affidavits That MDC Was Paying its Lower Tiers**

26. During the course of working on the Project, between July 1, 2019 and January 14, 2020, Delahunt signed at least 8 lien waivers in Bergen County, New Jersey, under oath, as president of MDC in connection with pay applications in the Project, representing to Geis that:

5

> Lower-Tier Claimant further represents and warrants that it has paid all of its laborers, sub-subcontractors, vendors, unions, and suppliers in full, or that the proceeds of the Current Payment will be applied solely and exclusively to the payment of the persons or entities that have supplied labor, materials, equipment, services, or tools to Lower-Tier Claimant for the Project to fully and completely resolve all of Lower-Tier Claimant's Project-related debts to the extent of the Current Payment. Lower-Tier Claimant understands that the representations and warranties in this instrument are a material inducement to Geis's release of Current Payment to Lower-Tier Claimant, and Lower-Tier Contractor agrees to indemnify, defend, and hold harmless Geis, the Project owner(s), the Project, the Project lender, the Project lessees, General Contractor, and General Contractor's and/or Geis's payment bond surety, from and against claims by any person or entity employed by or through Lower-Tier Claimant to recover the value of the labor, materials, equipment, or services to the extent of the Current Payment.

27. Geis reasonably relied on these waivers in making payments to Delahunt. As indicated below, Delahunt had a duty to be honest, but fraudulently executed the waivers.

**MDC Failed to Pay Its Lower Tiers Because Delahunt Was Taking the Cash**

28. Despite receiving money from Geis, and in spite of Delahunt's sworn representations in the lien waivers that either (a) MDC had paid all lower tiers in full, or (b) all payments sought in the pay applications would be applied solely to pay lower tiers, in November or December 2019, Geis first learned that MDC had failed to pay approximately $600,000.00 to the labor crew subcontractor and the rebar company supplier. This was the first time Geis learned that the labor on the Project was being subcontracted.

29. In response to learning about this payment delinquency, Geis then called all known MDC lower-tiers to determine the overall scope of the payment delinquencies.

30. MDC subcontractors informed Geis that Delahunt kept promising to make payment but asked the subcontractors to remain patient and quiet. Upon information and belief, Delahunt wanted to hide MDC's payment failures for as long as possible, so that Geis would continue to pay MDC directly.

31. Upon information and belief, Delahunt was taking the money that Geis paid to MDC, out of MDC's accounts, and using that money for Delahunt's personal purposes, and not Project-related purposes. Geis subsequently began requiring two-party checks going forward.

32. Geis subsequently learned that MDC's payment delinquencies were not limited to the labor crew and rebar company supplier. For example, the rebar supplier was owed $208,447.29, the formwork supplier was owed $303,350.02, the equipment rental company was owed $36,012.90 and the lumber supplier was owed $7,345.86.

33. After confronting Delahunt regarding these payment deficiencies, Geis was told by Delahunt that MDC was unable to pay its suppliers. Upon information and belief, Delahunt diverted the money received from Geis to other bank accounts unrelated to MDC or the Project.

34. Geis attempted to work with MDC to complete MDC's work, including making past-due payments to MDC's subcontractors that MDC had failed to make, via two-party checks out of MDC's subcontract balance, and assisting MDC with project management, scheduling, coordination, and other steps to help MDC manage its Subcontract work.

35. Sadly, Delahunt failed to even work with Geis on this, shirked his management duties, did not accept Geis's help, and then complained when Geis did not coordinate as Delahunt would have done. Delahunt also began delaying two-party check signings to vendors which affected manpower and material deliveries to the Project. It became clear to Geis that Delahunt was no longer willing to work to mitigate damages.

36. Delahunt failed to respond to Geis' requests and demands on how Delahunt and MDC would complete its work, fund subcontractors, and cure prior payment and performance breaches.

37. Delahunt refused to provide further assistance to Geis unless Geis began paying MDC again directly because Delahunt had expenses that needed to be covered. After Geis refused to pay MDC directly, Delahunt then did nothing to right the MDC ship.

**MDC Failed to Cure and Geis had to Terminate MDC**

38. As a result of MDC's breaches of the Subcontract, including its failures to pay its lower tiers, Geis terminated the Subcontracts and is now completing MDC's subcontract work on the Project, resulting in a subcontract deficiency forecasted to exceed $2.5 million.

39. The Subcontracts contain arbitration clauses, and Geis is therefore pursuing arbitration against MDC. Upon information and belief, MDC may be judgment-proof.

40. The representations made by Delahunt in the lien waivers between July 2019 and January 2020 that either (a) MDC had paid all lower tiers in full, or (b) all payments sought in the pay applications would be applied solely to pay lower tiers, were made by Delahunt with knowledge of their falsity.

41. These representations made by Delahunt were made with the intention to deceive Geis.

42. These representations made by Delahunt were made with the intention that Geis would rely upon these representations and pay MDC.

43. Geis reasonably relied on these representations made by Delahunt in the lien waivers to pay MDC for work on the Project.

44. As a result in this reliance, Geis has been damaged in an amount projected to exceed $2,500,000.00.

**The Flaherty Letter is Fraudulent**

45. On or about April 29, 2020, Geis decided to call Edwards & Company Insurance, which had provided the Flaherty Letter in June 2019 indicating that "MDC HI Inc. has a Surety Bond Program with a $10,000,000.00 aggregate limit procured through Edwards & Company Insurance Brokerage placed with Liberty Mutual," to inquire about the status of MDC. See **Exhibit A**.

46. In response to this inquiry, Geis received a call from the President and CEO of Edwards & Company Insurance Brokerage indicating that (i) Edwards & Company does not offer a surety program but instead only provides property insurance; (ii) Edwards & Company does not have a surety bond with MDC; and (iii) the signer of the Flaherty Letter, Sean P. Flaherty, has never been an officer of Edwards & Company and could not have written a letter of this nature.

47. Upon information and belief, Delahunt forged the Flaherty Letter and delivered it to Geis with knowledge of its falsity, with the intention to deceive Geis, and with the intention that Geis would rely upon the Flaherty Letter in determining whether to sign the Subcontracts with MDC. Delahunt breached his duty to provide accurate information and not misrepresent a fact forming the basis of the Subcontracts.

## COUNT I—FRAUDULENT INDUCEMENT

48. Geis realleges and incorporates by reference Paragraphs 1-47 as if fully restated herein.

49. Under Geis's Prime Contract with the Owner for the Project, a payment and performance bond was not required of a subcontractor "in the event that a surety reasonably approved by the Owner's lender provides a surety letter demonstrating the bonding capacity of [the subcontractor]":

> 9.1.7 Surety Bonds:
>
> Under the Construction Manager's Prime Contract with the Owner, the term "Major Subcontractors" is defined to mean all mechanical, electrical and plumbing subcontractors, and all subcontractors who will receive in excess of $2,000,000 for their Work on the Project. The Prime Contract also provides that a payment and performance bond shall not be required of a "Major Subcontractor" in the event that a surety reasonably approved by the Owner's Lender provides a surety letter demonstrating the bonding capacity of a "Major Subcontractor" and such bonding capacity is deemed satisfactory by the Owner's Lender in the Lender's reasonable discretion.
>
> In the event that the Trade Contractor does not meet the definition of a "Major Subcontractor" under the Prime Contract as set forth above, no bonding shall be required and this Section 9.1.7 shall not apply to the Trade Contractor or this Agreement.
>
> If, however, the Trade Contractor hereunder (i) is a "Major Subcontractor" as above defined, (ii) the Owner's Lender is not satisfied with the required surety submission and (iii) requires the Trade Contractor to post a payment and performance bond, then, and in that event, the Trade Contractor shall post Payment and Performance Bonds relating to the Work in the full amount of the Trade Contract Sum set forth in Section 4.1 above, and which Bonds shall name the Borrower/Owner, the Construction Manager, the Township of West Orange and Owner's Lender as dual/multiple obligees.

50. Prior to Geis entering into the Subcontracts with MDC, Delahunt handed Geis's Kevin Watts a June 14, 2019 letter at Geis's offices in Hackensack, New Jersey that purported to be from Sean P. Flaherty at Edwards & Company Insurance in Sayville, New York, addressed to Geis:

> Please accept this letter as verification that MDC HI Inc. has a Surety Bond Program with a $10,000,000.00 aggregate limit procured through Edwards & Company Insurance Brokerage placed with Liberty Mutual.
>
> There are currently no open bonds outstanding at this time. 2018 tax returns and current interim financials have been reviewed as of June 1, 2019 and this program is active.
>
> If you should have any questions please feel free to contact me. I look forward to continuing a long and prosperous business relationship with Mr. Delahunt and his organization.
>
> Respectfully,
>
> Sean P. Flaherty, CRIS.

See **Exhibit A**.

10

51. Given this bonding capacity requirement in the Prime Contract, Geis reasonably relied upon the Flaherty Letter in deciding to sign the Subcontracts with MDC.

52. In April 2020, approximately 10 months after receiving the Flaherty Letter, Geis learned that (ii) the Flaherty Letter was forged; (ii) Edwards & Company does not offer a surety program; and (iii) Edwards & Company does not have a surety bond with MDC.

53. Upon information and belief, Delahunt forged the Flaherty Letter and delivered it to Geis (i) with knowledge of its falsity, (ii) with the intention to deceive Geis, and (iii) with the intention that Geis would rely upon the Flaherty Letter in determining whether to sign the Subcontracts with MDC.

54. The supposed existence of MDC's bonding capacity expressed in the forged Flaherty Letter was a knowing material representation of a presently existing fact.

55. Delahunt's actions in forging the Flaherty Letter were willfully and wantonly reckless or malicious.

56. Geis reasonably and justifiably relied upon the Flaherty Letter in deciding to sign the Subcontracts with MDC.

57. As a result of this reliance upon the Flaherty Letter, Geis has been damaged in an amount forecasted to exceed $2,500,000.00.

58. While Delahunt was the President of MDC at the time, he personally participated in this fraudulent inducement.

59. At the time the Flaherty Letter was delivered, MDC owed independent duties to Geis to (i) refrain from misrepresenting a fact forming the basis of the Subcontracts; and (ii) not to commit an intentional tort.

60. As Delahunt is (i) MDC's president; (ii) MDC's contact with Geis; and, (3) upon information and belief, MDC's sole shareholder and employee, MDC effectively delegated these duties to Delahunt.

61. Delahunt breached these independent duties by personally delivering the Flaherty Letter to Geis.

**WHEREFORE**, Geis demands judgment in its favor and against Jaime Delahunt for the full amount of damages, exceeding $2,500,000.00, to be proven at trial, which includes, without limitation, compensatory, consequential, incidental and punitive damages, attorneys' fees, pre-judgment and post-judgment interest, and for such other further relief in favor of Geis as the Court may deem just and proper.

## COUNT II—FRAUDULENT INDUCEMENT

62. Geis realleges and incorporates by reference Paragraphs 1-61 as if fully restated herein.

63. After Delahunt indicated he would need help meeting payroll, Geis agreed to "float" payments to MDC, paying MDC every two weeks.

64. During the course of working on the Project, between July 1, 2019 and January 14, 2020, Delahunt signed approximately 8 lien waivers in Bergen County, New Jersey as President of MDC in connection with pay applications in the Project, representing to Geis that:

> Lower-Tier Claimant further represents and warrants that it has paid all of its laborers, sub-subcontractors, vendors, unions, and suppliers in full, or that the proceeds of the Current Payment will be applied solely and exclusively to the payment of the persons or entities that have supplied labor, materials, equipment, services, or tools to Lower-Tier Claimant for the Project to fully and completely resolve all of Lower-Tier Claimant's Project-related debts to the extent of the Current Payment. Lower-Tier Claimant understands that the representations and warranties in this instrument are a material inducement to Geis's release of Current Payment to Lower-Tier Claimant, and Lower-Tier Contractor agrees to indemnify, defend, and hold harmless Geis, the Project owner(s), the Project, the Project lender, the Project lessees, General Contractor, and General Contractor's and/or Geis's payment bond surety, from and against claims by any person or entity employed by or through Lower-Tier Claimant to recover the value of the labor, materials, equipment, or services to the extent of the Current Payment.

65. Despite receiving money from Geis, and in spite of these representations in the lien waivers that either (a) MDC had paid all lower tiers in full, or (b) all payments sought in the pay applications would be applied solely to pay lower tiers, in November or December 2019, Geis learned that MDC had been delinquent in paying its lower tiers by approximately $600,000.00 to the labor crew and the rebar company supplier.

66. In response to learning about this delinquency, Geis then called all known MDC lower-tiers to determine the overall scope of the payment delinquencies.

67. Geis subsequently learned that MDC's payment delinquencies were not limited to the labor crew and rebar company supplier. All told, the delinquent amount owed to the labor crew, rebar supplier, lumber supplier, equipment rental company, and formwork supplier was approximately $1,170,604.05.

68. After confronting Delahunt regarding these payment deficiencies, Geis was told by Delahunt that MDC was unable to pay its suppliers.

69. Upon information and belief, Delahunt took the money from MDC's accounts and used it for personal and/or non-Project expenses.

70. The representations made by Delahunt in the lien waivers between July 2019 and January 2020 that either (a) MDC had paid all lower tiers in full, or (b) all payments sought in the

13

pay applications would be applied solely to pay lower tiers, were made by Delahunt with knowledge of their falsity.

71. The representations that either (a) MDC had paid all lower tiers in full, or (b) all payments sought in the pay application would be applied solely to pay lower tiers, constitute knowing material representations of a presently existing fact.

72. Delahunt's actions in making the above misrepresentations in the lien waivers was willfully and wantonly reckless or malicious.

73. These representations made by Delahunt were made with the intention to deceive Geis.

74. These representations made by Delahunt were made with the intention that Geis would rely upon these representations and pay MDC.

75. Geis reasonably and justifiably relied on these representations made by Delahunt in the lien waivers to pay MDC for work on the Project.

76. As a result in this reliance, Geis has been damaged in an amount exceeding $2,500,000.00.

77. While Delahunt was the President of MDC at the time, he personally participated in this fraudulent inducement.

78. At the time these lien waivers were executed, MDC owed an independent duty to Geis not to commit an intentional tort.

79. As Delahunt is (i) MDC's president; (ii) MDC's contact with Geis; and, (3) upon information and belief, MDC's sole shareholder and employee, MDC effectively delegated this duty to Delahunt.

80. Delahunt breached this independent duty through his above actions.

**WHEREFORE**, Geis demands judgment in its favor and against Jaime Delahunt for the full amount of damages, exceeding $2,500,000.00, which includes, without limitation, compensatory, consequential, incidental and punitive damages, attorneys' fees, pre-judgment and post-judgment interest, and for such other further relief in favor of Geis as the Court may deem just and proper.

**NOW, WHEREFORE**, the Plaintiff, Geis Construction South, LLC, prays for and demands judgment as follows:

1. Judgment on Count I of its Complaint against Defendant Jaime Delahunt, for the full amount of damages to be proven at trial, which includes, without limitation, compensatory, consequential, incidental and punitive damages, attorneys' fees, and pre-judgment and post-judgment interest.

2. Judgment on Count II of its Complaint against Defendant Jaime Delahunt, for the full amount of damages to be proven at trial, which includes, without limitation, compensatory, consequential, incidental and punitive damages, attorneys' fees, and pre-judgment and post-judgment interest.

3. For any and all other relief that the Court may deem just, equitable, and proper.

Dated: August 20, 2020

**Respectfully submitted,**

_____
Christopher Nucifora (NY No. 5473384)
Kaufman Dolowich Voluck LLP
25 Main Street, Suite 50
Hackensack, New Jersey 07601
Phone: 201.488.6655
Facsimile: 201.488.6652
cnucifora@kdvlaw.com

and

        Aaron S. Evenchik (Ohio No. 0073809)
*Pro hac vice application to be filed*
Charles W. Pugh (Ohio No. 0078145)
*Pro hac vice application to be filed*
HAHN LOESER & PARKS LLP
200 Public Square, Suite 2800
Cleveland, Ohio 44114
Phone: 216.621.0150
aevenchik@hahnlaw.com
cpugh@hahnlaw.com

*Attorneys For Geis Construction South, LLC*

4850-0827-9496, v. 1