UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
GEIS CONSTRUCTION SOUTH, LLC,

          Plaintiff,       **REPORT AND**
                    <u>**RECOMMENDATION**</u>

                    20-CV-03834 (MKB) (JMW)

    -against-

JAIME DELAHUNT,

          Defendant.
------------------------------------------------------------------------X

**A P P E A R A N C E S:**

    Christopher Nucifora, Esq.
    **Kaufman Dolowich & Voluck, LLP**
    25 Main Street
    Court Plaza North, Suite 500
    Hackensack, NJ 07601
    *Attorney for Plaintiff*

    Aaron Evenchik, Esq.
    Charles Pugh, Esq.
    **Hahn Loeser & Parks LLP**
    200 Public Square, Suite 2800
    Cleveland, OH 44115
    *Attorneys for Plaintiff*

    Joseph Z. Amsel, Esq.
    **Law Offices of Joseph Z. Amsel**
    43 West 43rd Street, Suite 265
    New York, NY 10036
    *Attorney for Defendant*

**WICKS,** Magistrate Judge:

Plaintiff Geis Construction South, LLC ("Geis" or "Plaintiff") commenced this action against Defendant Jaime Delahunt ("Delahunt" or "Defendant") alleging that Defendant fraudulently induced Plaintiff to enter into two subcontracts with Defendant's company, MDC Home Improvements, Inc. ("MDC"),[1] in connection with Plaintiff's work on the Wonder Lofts Project in Hoboken.  Before the Court, on referral from the Honorable Chief Judge Margo K. Brodie, is Plaintiff's motion for a damages hearing.  (ECF No. 36); (Electronic Order dated Oct. 2, 2023.)  A two-day evidentiary hearing was held on January 4, 2024 and May 1, 2024, before the undersigned.  For the reasons that follow, the undersigned respectfully recommends that the Plaintiff's motion be granted in the amounts recommended herein.

## FACTUAL BACKGROUND

In light of the undersigned's previously issued Report & Recommendation ("R&R") (*see* ECF Nos. 19 and 28), the Court assumes the parties' familiarity with the underlying facts and allegations of this case.  As relevant here, Defendant is a resident of Nassau County, New York and is the president of MDC, a concrete subcontractor.  (ECF No. 1 at 2.)  Plaintiff, a construction company based in Ohio, sought to work on the Wonder Lofts Project (the "Project") in Hoboken, New Jersey, and selected MDC as concrete subcontractor on the Project.  (*Id.*)  Under Plaintiff's prime contract with the owner of the Project, a payment and performance bond were not required of a subcontractor "in the event that a surety reasonably approved by the [o]wner's lender provides a surety letter demonstrating the bond capacity of [the subcontractor]."  (*Id.*)  Plaintiff accordingly shared this requirement with Defendant and requested a bond availability letter.  (*Id.* at 3.); (*see also* ECF No. 46 at 7) ("January 4, 2024 Transcript")

---

[1] MDC is a concrete, masonry, and excavation company.  (ECF No. 48 at 2.)

(explaining that the letter was to demonstrate that the company was "bondable" or had "the ability to have binding capacity"). In response, Defendant fraudulently submitted a letter to Plaintiff that purported to be from Sean P. Flaherty (the "Flaherty letter") from Edwards & Company Insurance which stated that "MDC HI Inc. has a Surety Bond Program with $10,000.00 aggregate limit." (ECF No. 1 at 3.) Plaintiff relied on the Flaherty letter and awarded a number of subcontracts to Defendant and MDC. (*Id.* at 4.)

Plaintiff alleges that, after being awarded the subcontracts, Defendant consistently demanded that Plaintiff advance payments to MDC for work not yet performed. (*Id.* at 5.) During the course of working on the Project, Defendant executed at least eight lien waivers[2] under oath, misrepresenting that he was properly paying all subcontractors for the Project when this was not the case. (*Id.* at 5–6.) Plaintiff avers that it relied on these lien waivers in continuing to make payments to Defendant for work on the Project. (*Id.* at 6.)

In 2020, Plaintiff believed that Defendant was paying subcontractors, but after receiving inquiries regarding timing of payment from them, Plaintiff grew suspicious. (ECF No. 48 at 5.) Plaintiff was forced to pay these subcontractors because Defendant never paid them despite having the money in hand from Plaintiff to pay these subcontractors. (*Id.*) Ultimately, Plaintiff was forced to terminate the subcontracts with Defendant and MDC, allegedly costing Plaintiff more than $22,500,000.00 and was further forced to close its New Jersey office and lay off the employees in that office. (*Id.* at 8.) Moreover, Plaintiff alleges that it contacted Edwards & Company to inquire about the status of MDC. (ECF No. 1 at 9.) The CEO of Edwards &

---

[2] According to Plaintiff, the partial lien waivers "represented a personal guarantee from Delahunt that the amounts paid to MDC have been paid to MDC's lower tiers and that, upon cashing of the check, all of the lower tiers' claims have been paid and are up to date. The Partial Lien Waiver further indicates (i) a subcontractor did work on the property; (ii) the subcontractor acknowledges the amount owed to it; (iii) the subcontractor acknowledges that it was paid; and (iv) the subcontractor waives its lien rights because it has been properly paid for the work." (ECF No. 48 at 4.)

Company responded that it does not offer a surety program and did not have a surety bond with MDC. (*Id.*) He additionally noted that Flaherty was not an officer of Edwards & Company and could not have written the Flaherty letter. (*Id.*) Plaintiff alleges that, based on its discussion with Edwards & Company, Defendant forged the Flaherty letter to induce Plaintiff into awarding him and MDC the subcontracts. (*Id.*)

## PROCEDURAL SETTING

In May of 2020, Plaintiff commenced an arbitration proceeding claiming breach of contract against MDC only, alleging that Plaintiff is entitled to full reimbursement of cost overruns relating to MDC's breaches of two subcontracts in connection with the Project. (ECF No. 26-1 at 10.) MDC defaulted and did not participate in the arbitration proceedings. (*Id.*) On April 1, 2021, the arbitration panel issued a Final Award in Plaintiff's favor finding (i) "[t][here is no question that [MDC] breached the subcontracts it entered into with [MDC]"; (ii) that Plaintiff proved it was damaged in the amount of $9,954,713.86; (iii) awarding attorney's fees of $45,139.75; and (iv) concluding that MDC was responsible for the American Arbitration Association administrative fees and the compensation of the Arbitrators, for a total amount of damages awarded to Plaintiff in the amount of $10,021,831.10. (*Id.*) Plaintiff then commenced an action in the Eastern District to confirm the award. (*Id.*) (*See Geis Construction South, LLC v. MDC Home Improvements, Inc.* (21-cv-02407 (LDH) (ST))).[3] Since filing the motion for a damages inquest, though, MDC has not satisfied any portion of the arbitration award. (ECF No. 36 at 7.)

Plaintiff commenced this lawsuit on August 20, 2020, asserting two claims of fraudulent

---

[3] On September 23, 2022, the Honorable LaShann DeArcy Hall adopted the Report and Recommendation of Magistrate Judge Steven L. Tiscione, confirming the arbitration award. (*See* 21-cv-02407, Electronic Order dated Sept. 23, 2022.) A final judgment has since been entered in that case. (*Id*. at ECF No. 23.)

inducement.  (ECF No. 1.)  Defendant did not file an answer or otherwise respond to Plaintiff's

Complaint, prompting Plaintiff to request a certificate of default from the Clerk of the Court.

(ECF No. 13.)  On April 14, 2021, the Clerk entered a Certificate of Default, which was closely

followed by a motion by Plaintiff for a default judgment pursuant to Rule 55 on April 26, 2021.

(ECF No. 15.)  On December 2, 2021, the undersigned issued an R&R recommending that the

Court grant Plaintiff's motion for a default judgment as to Defendant's liability but that the

determination of damages be based on written submission rather than an evidentiary hearing as

requested by Plaintiff.  (ECF No. 19.)  Just eight days later, Defendant appeared in the action,

represented by counsel.  (ECF No. 21.)  The parties then bundle-filed a motion to vacate the

certificate of default on April 11, 2022.  (ECF Nos. 26-27.)  On October 3, 2022, on referral from

the Honorable Chief Judge Margo K. Brodie, the undersigned issued a R&R recommending that

the Court deny Defendant's motion to vacate because Defendant's default was willful, he had no

meritorious defenses, and there would be prejudice to the Plaintiff if the Court were to vacate the

default against Defendant.  (ECF No. 28.)  The undersigned did not address the issue of

damages, but rather only ruled upon Defendant's liability.  (*See id.* at 19.)

Of note here, is Defendant's objection to the undersigned's R&R (ECF No. 33) in which

he posed similar arguments in his motion to vacate pertaining to his lack of willfulness and

prejudice to Plaintiff as well as his meritorious defenses as the bases for granting his motion to

vacate.  However, regarding damages, Defendant emphasized that Plaintiff would receive "a

windfall double recovery for the same alleged wrong" in this action since it had already obtained

an arbitration award against MDC and would thus bring about a harsh or unfair result.  (ECF No.

33 at 19-20.)  Plaintiff also filed an opposition to Defendant's objection to the R&R.  (ECF No.

34.)

On March 31, 2023, the Court adopted the undersigned's R&R, granting Plaintiff's motion for default judgment and denying Defendant's motion to vacate.  (ECF No. 35.)  Chief Judge Brodie found that Defendant had not shown good cause to vacate the entry of default.  (*Id.* at 10-21.)  She also adopted the portions of the undersigned's R&R denying Plaintiff's motion for a determination of damages based on written submission rather than an evidentiary hearing. (*Id.* at 22.)

On July 6, 2023, Plaintiff filed a motion for the Court to schedule a damages hearing arising from Defendant's fraudulent inducement to determine the amount of damages Plaintiff is owed.  (ECF No. 36.)  Defendant filed a motion for extension of time to file a response to Plaintiff's motion (ECF No. 37) which the Court granted, and the motion was referred to the undersigned.  (Electronic Order dated Oct. 2, 2023.)  On October 15, 2023, the undersigned directed Plaintiff to "submit additional, more detailed documentation separating each of the damages categories as set forth in ECF No. [36-1] at 2" on or before November 3, 2023, which it did. [4]  (ECF Nos. 38-39.)  The undersigned ordered an in-person hearing for January 4, 2024. (ECF No. 41.)

The Court granted Plaintiff's request for an evidentiary hearing.  (ECF Nos. 36 and 42). Kevin Watts, Vice President of Construction at Geis Construction and project manager for Wonder Lofts, was the sole witness who testified on both days of the hearing.  Exhibits were also admitted into evidence through Watts.  (ECF No. 45.)  Watts discussed his position at Geis and its connection to MDC.  (ECF Nos. 42 and 44.)  He also testified as to how he became apprised of Defendant's alleged misconduct.  (*Id*.)  Defendant did not call any witness to testify at the

---

[4] Plaintiff was advised to provide a chart or table for *each* category of damages it seeks, including the amounts charged to each of those categories and the pages from ECF No. 36-1 that pertain to the listed charged.  (ECF No. 38.)

hearing. Following the hearing, the parties filed post-hearing proposed findings and conclusions. (ECF Nos. 48 and 49.)

Plaintiff avers that it demonstrated its entitlement to all damages. Namely, for compensatory damages, it has (1) cited to the Court's prior finding that the fraud claim is distinct from the breach of contract claim; (2) cited cases which state that defendants like Delahunt cannot blame the victim for failure to discover the fraud—here the alleged fraudulent Flaherty letter—sooner, especially given that it has never experienced such circumstances like this before; (3) shown that Defendant produced no evidence demonstrating how much, if any, monies were paid to the lower tier subcontractors; and (4) demonstrated that Plaintiff is entitled to the compensatory damages given Plaintiff's reliance on the fraudulent Flaherty letter and the lien releases. (ECF No. 48.) In addition, it states that it is entitled to punitive damages, which in New York, only requires the movant to demonstrate morally culpable conduct, not a public wrong, when like here, there is no contractual relationship between the parties. (*Id*.) Delahunt's fraud was morally reprehensible, as it led to widespread, "ruinous consequences" for Geis and warrants punitive damages equal to compensatory damages, despite the already substantial amount to be disbursed. (*Id*. at 15.) Finally, it states that it is entitled to pre-judgment interest from February 28, 2020 to the date final judgment is entered at a rate of nine percent per annum as well as post-judgment interest once final judgment is entered and judgment is not paid. (*Id*. at 17-18.)

Defendant however maintains that Plaintiff has failed to establish support that any damages are owed. Specifically, with respect to compensatory damages, Delahunt completed the requisite construction work and thus Plaintiff's damages calculations fails to take this into account. (ECF No. 49 at 3.) Relatedly, he states that the lower tier subcontractors would not

have completed the work or made such progress if they were not getting paid as Plaintiff alleges. (*Id*. at 5-6.)  Further, Geis's letter denoting Defendant's default and the testimony regarding inquiries from lower tier subcontractors about nonpayment are hearsay, especially given that Plaintiff did not and could not establish how the amounts in the default letter were calculated and how much money was owed to the subcontractors.  (*Id*. at 3-4.)  Moreover, Geis, as the party with the burden to prove damages are warranted, did not call the subcontractors to establish whether Delahunt had indeed paid them anything.  (*Id*. at 6.)  Failure to establish these damages disentitles Geis to every penny it requests.  If anything, Defendant states that Plaintiff is only eligible for $832,614.91, the monetary amount totaling all of the checks admitted into evidence at the hearing.  (*Id*. at 7.)

Defendant also states that Plaintiff is not entitled to punitive damages, as Plaintiff's claim stems from a contractual relationship with MDC and it cannot establish a public wrong since the fraud was only limited between the parties—and not widespread, work was getting done, and Geis could have verified the contents of the Flaherty letter earlier to avoid its purported losses. (*Id*. at 10-11.)  He also states it has not presented support for any kind of interest.  (*Id*. at 8.) Finally, he states that any damages awarded would lead to a double recovery given that it already received an arbitration award from MDC for the same conduct.  (*Id*. at 12-13.)

## LEGAL FRAMEWORK

Once liability for default is established, the next inquiry is damages.  A party's default constitutes a concession of all well pleaded allegations, however, such default "is not considered an admission of damages." *Double Green Produce, Inc. v. F. Supermarket Inc*., 387 F. Supp. 3d 260, 271 (E.D.N.Y. 2019) (quoting *Cement & Concrete Workers Dist. Council Welfare Fund, Annuity Fund, Educ. & Training Fund & Other Funds v. Metro Found. Contractors Inc.*, 699

F.3d 230, 234 (2d Cir. 2012)).  Regardless of "the absence of opposition" due to the default of

defendant, "the court cannot simply accept a statement of the plaintiff concerning the amount of

damages, but rather must be provided with evidentiary proof that establishes the amount of

damages." *Century 21 Real Est. LLC v. Team Mates Realty Corp.*, No. 07-cv-4134 (NG) (VVP),

2009 WL 910655, at *5 (E.D.N.Y. Feb. 18, 2009), *report and recommendation adopted*, 2009

WL 890561 (E.D.N.Y. Mar. 31, 2009).  Although "court[s] must ensure that there is a basis for

the damages specified in a default judgment, [they] may, but need not, make the determination

through a hearing." *Fustok v. Conticommodity Servs., Inc.*, 122 F.R.D. 151, 156 (S.D.N.Y.

1998), *aff'd*, 873 F.2d 38 (2d Cir. 1989).

## DISCUSSION

Plaintiff seeks: (1) $5,667,222.33 in compensatory damages, as well as (2) punitive

damages equal to compensatory damages; (3) pre- and post-judgment interest; and (4) $300 in

costs.  (ECF No. 36 at 4, 8.)  Excluding interest, Geis seeks a total of $11,334,744.66 in

damages.  (*Id.*)

### A.  Compensatory Damages

Plaintiff seeks the following compensatory damages[5]:

| | |
|---|---|
| **Concrete Damages (including payments made directly to MDC and payments to lower tier subcontractors)** | $5,536,775.19 |
| **Masonry Damages** | $130,447.14 |
| **TOTAL** | $5,667,222.33 |

(ECF No. 39-1.)

---

[5] At the hearing, Plaintiff stated that compensatory damages have been "scaled back" from $7,483,692.57 to approximately $5.5 million.  (ECF No. 42); (ECF No. 36-1 at 2.)

"Damages for fraud are measured under the out-of-pocket rule; a plaintiff may only recover actual pecuniary loss that directly resulted from the fraud." *Vox Advertising & Design, Inc. v. Makela*, No. 99-cv-10097 (AGS), 2000 U.S. Dist. LEXIS 16533, at *6 (S.D.N.Y. Nov. 14, 2000); *see also Syncora Guar. Inc. v. Countrywide Home Loans, Inc.,* 935 N.Y.S.2d 858, 869 (N.Y. Sup. Ct. 2012) ("Compensatory damages are intended to make the victim of wrongdoing whole" or otherwise "compensate the injured party for its losses."); *Lama Holding Co. v. Smith Barney Inc.,* 668 N.E.2d 1370, 1373 (N.Y. 1996) (stating that damages awarded on a fraudulent inducement claim includes "indemnity for the actual pecuniary loss sustained as the direct result of the wrong" and plaintiffs cannot recover for profits that would have been realized).

The undersigned first finds that Plaintiff would be entitled to the requested compensatory damages.  Defendant urges the Court to find that the damages sought here would amount to a "double recovery" since the arbitration award in his view already covered much of the requested damages.  (ECF No. 49 at 11-12.)  However, the Court previously concluded that the measure of damages recoverable for being fraudulently induced to enter into a contract is *distinct* from contract damages.  (*See* ECF No. 28 at 19); *see also Carlone v. Lion & The Bull Films, Inc.,* 61 F. Supp. 2d 312, 325 (S.D.N.Y. 2012) ("To maintain a fraud claim that stems from a breach of contract, the allegations of fraud must be *sufficiently distinct* from the breach of contract claim.") (emphasis added).  Damages in a fraudulent inducement action represent the "loss suffered through th[e] inducement" distinct from damages recoverable for breach of contract.  *Spinelli v. Nat'l Football League*, 903 F.3d 185, 211 (2d Cir. 2018).

Indeed, Chief Judge Brodie already found that the Plaintiff's claims for damages are *not* duplicative of the arbitration award.  In her prior Order, she stated:

> Plaintiff's fraud claim is not duplicative of its breach of contract claim against MDC because Defendant was not a party to the contract between Plaintiff and MDC. *See In re*

10

*Fyre Festival Litig.*, 399 F. Supp. 3d 203, 212 (S.D.N.Y. 2019) ("Because neither [defendant was a] party to the contract at issue, the fraud claims against them are not duplicative of the breach of contract claim."); *see also McKnight as Tr. of Stacia L. McKnight Revocable Tr. v. 65 Dune Road LLC*, No. 19-CV-4172, 2020 WL 9816015, at *15 (E.D.N.Y. Nov. 16, 2020) ("However, corporate officers may not be held personally liable on contracts of their corporations, provided they did not purport to bind themselves individually under such contracts").

(ECF No. 35 at 18.)

To support its entitlement to compensatory damages, Plaintiff first relies heavily on the Flaherty letter in awarding MDC subcontracts for both concrete and masonry work. (ECF No. 36 at 9.) At the evidentiary hearing, Watts, Vice President of Construction at Geis, testified that MDC was required to demonstrate that it had bonding capacity. (January 4, 2024 Transcript at 7-8.) The letter essentially "showed that [MDC was] bondable up to an amount $10,000, which is all the prime contract required." (*Id*. at 8.) Watts stated that Geis put "quite a bit of importance" on this letter and emphasized that Geis would not have hired MDC had it not received the letter. (*Id*. at 8-9.) Geis contacted Edwards and Company and discovered that the company never issued the Flaherty letter. (*Id*. at 11.) Watts testified that Geis has never needed to verify such bonding capacity letters in the past, as they have all been truthful. (ECF No. 48 at 11.)

Next, with regard to the lien waivers, Watts testified that these are notarized, "legal document[s]" that act as "a personal guarantee by Mr. Delahunt that the amounts paid to him by [Geis] have, in fact, been paid to his lower tiers." (January 4, 2024 Transcript at 26.) From July 2019 to January 2020, Defendant signed eight (8) lien waivers in which it made false claims on Plaintiff's behalf. (ECF No. 15-1 at 11) ("During the course of working on the Project, between July 1, 2019 and January 14, 2020, Defendant signed at least eight lien waivers in Bergen County, New Jersey, under oath, as president of MDC in connection with pay applications in the Project, representing to Geis that either (a) MDC had paid all lower tiers in full; or (b) all

11

payments sought in the pay applications would be applied solely to pay lower tiers.")  For example, for pay application number 2, Defendant signed and notarized the document which indicates that "upon cashing of th[e] check, all of the lower tier claims have been paid." (January 4, 2024 Transcript at 33-34.)  Like the bond letter, Plaintiff significantly relied upon the lien waivers it received from Defendant and Defendant would not have been paid without submission of these waivers.  (*Id*. at 34.)

Around January 2020, Plaintiff discovered that Defendant was not paying its lower tier subcontractors.  (*Id*. at 10.)  This was "alarming" to Plaintiff especially because it had been paying MDC every two weeks for it to then give these subcontractors.  (ECF No. 47 at 16) ("May 1, 2024 Transcript").  Geis then stopped all payments to MDC and spoke with each subcontractor and "summed those amounts" owed to them by MDC.  (January 4, 2024 Transcript at 15); (ECF No. 36 at 9-10) (stating that because of Defendant's fraudulent acts, Plaintiff was forced "to make past-due payments to MDC's subcontractors and incur significant costs to complete the concrete and masonry work that MDC was originally contracted to perform.")  The amounts Geis paid to MDC includes pay applications and totals millions of dollars for the concrete work and more than $130,000 for the masonry portion.  (*Id*. at 18-19.)  Thus, Delahunt's statement that he paid the lower tier subcontractors was wholly at odds with the complaints received by Watts from those same subcontractors.

While Plaintiff has the burden to establish damages, Defendant Delahunt himself did not testify at the hearing, nor did Defendant call *any* witnesses.  (*See* ECF Nos. 42 and 44.)  Indeed, Defendant's testimony would have been insightful given that at several points during Watts's cross-examination, Watts stated that he did not know whether the subcontractors were paid their

appropriate amounts and that "Delahunt would have to attest to that."  (May 1, 2024 Transcript at 34, 36.)

Notably, even despite Defendant's urging for the Court to find that Geis has failed to establish that Defendant failed to pay the lower tier subcontractors, his non-payment is evident from Watts's testimony stating that he received queries from these subcontractors as to when they would get paid.  (ECF No. 48 at 5.)  Further, Defendant states that Geis seeks to recover damages for monies that *may have* been paid to the lower tier subcontractors and those queries did not have specific information as to how much was missing from their paychecks.  (ECF No. 49 at 3-4.)  However, Defendant has not rebutted Geis's request for damages with evidence of monies that were *indeed paid* to these entities nor did he definitively say that he paid the subcontractors.  Instead, he states in a conclusory manner that Defendant was doing work at the job site for over six months but fails to describe how much and when it actually paid these subcontractors.  (*Id*. at 4-5.)  But A does not equal B.  In other words, the work may have been getting done but the employees may not have been getting paid.

Defendant also sought to obtain admissions from Plaintiff's witness, including whether Defendant used the money to reimburse himself for expensive materials on the job and whether it was customary for companies like Plaintiff's to pay contractors upfront although work had not yet been performed.  (May 1, 2024 Transcript at 28-29.)  However, these attempts to gain admissions are futile in light of the evidence adduced at the hearing demonstrating Plaintiff's losses as a result of Defendant's fraud.  Further, Defendant did not provide any evidence that monies taken were in fact to reimburse himself for costly machinery associated with the Wonder Lofts project.

In addition to the testimony adduced at the hearing, the *documentation* provided also supports an award of compensatory damages.[6]  Specifically, the checks and corresponding pay applications submitted to MDC for the work performed were admitted into evidence at the hearing and a schedule of the damages was also submitted for the Court's review.  (*See* ECF Nos. 36-1, 39-1, and 45.)  Undeniably, courts in this District have awarded compensatory damages on fraud claims in the context of a default when a plaintiff submitted similar documentation.  *See Gov't Emples. Ins. Co. v. Frank,* No. 21-CV-1702 (DG) (LB), 2021 U.S. Dist. LEXIS 241607, at *8 (E.D.N.Y. Dec. 17, 2021) (noting that plaintiff submitted a declaration and tables scheduling out the unremitted down payments, prorated premiums, and claims paid out for fraudulently obtained insurance policies); *Allstate Ins. Co. v. Nazarov,* No. 11-cv- 6187 (PKC) (VMS), 2015 U.S. Dist. LEXIS 134481, at *57 (E.D.N.Y. May 19, 2015) (awarding compensatory damages for plaintiff's fraud claims upon its submission of affidavits and documentation for support).

However, because the supplemental documentation is riddled with inconsistencies and inaccuracies[7], the Court created its own chart for each of the categories of damages to determine how much Plaintiff is owed.  *See Castellanos v. Deli Casagrande Corp.*, No. 11-CV-245 (JFB) (AKT), 2013 U.S. Dist. LEXIS 45858, at *8-9 (E.D.N.Y. Mar. 7, 2013) (noting that the plaintiff's chart was "inaccurate or [contained] unexplained factual and legal assumptions" so the court did not rely on the information therein to make its damages determination).  After a review

---

[6]  Defendant states at worst it is responsible for the $832,614.91 because those were the only checks admitted at the hearing.  (ECF No. 49 at 12.)  However, he fails to recognize that both parties stipulated to all of the pay apps' and their corresponding checks' admission (*see* ECF No. 43).

[7] For example, the check amounts do not precisely match the pay application amounts.  In particular, Plaintiff states that Pay Application No. 5 amounts to $680,045.86, but the corresponding checks amount to $681, 142.71 (the sum of $225,000 and $456,142.71).  (*See* ECF No. 39-1; *see also* Exhibit C5.)  The undersigned uses the check disbursement amounts when determining Plaintiff's compensatory damages award.

of all the submitted documentation and testimony heard at the damages hearing, the Court

concludes that Plaintiff is entitled to the following compensatory damages:

| Category of Damages | Amount | Supporting Documentation |
|---|---|---|
| | $303,029.10 | Pay App: ECF No. 36-1 at 51, 58<br>Check: ECF No. 36-1 at 52 |
| | $553,492.80 | Pay App: ECF No. 36-1 at 59<br>Check: ECF No. 36-1 at 61 |
| | $566,262.94 | Pay App: ECF No. 36-1 at 67-68<br><br>Check: ECF No. 36-1 at 72 |
| | $553,071.90 | Pay App: ECF No. 36-1 at 77<br>Check: ECF No. 36-1 at 80 |
| | $136,727.87 | Pay App: ECF No. 36-1 at 98<br>Check: ECF No. 36-1 at 101 |
| | $270,357.61 | Pay App: ECF No. 36-1 at 105, 108<br>Check: ECF No. 36-1 at 110 |
| | $517,953.26 | Pay App: ECF No. 36-1 at 116<br>Wire Transfer Details: ECF No. 36-1 at 118 |
| | $575,645.58 | Pay App: ECF No. 36-1 at 120, 122<br>Check: ECF No. 36-1 at 127 |
| _Concrete_ Payments Made | $303,350.02 | Pay App: ECF No. 36-1 at 173<br>Check: ECF No. 36-1 at 172<br>DOKA |
| | $208,447.29 | Pay App: ECF No. 36-1 at 142<br>Check: ECF No. 36-1 at 141<br>Metal Partners |
| | $7,345.86 | Pay App: ECF No. 36-1 at 293<br>Check: ECF No. 36-1 at 292<br>Tulnoy Lumber |
| | $36,012.98 | ECF Nos. 36-1 at 6 and 39-2 at 2<br>Herc Rental |
| | $346,086.48 | ECF No. 36-1 at 6<br>J&G Contractor Inc. |
| | $225,000 | Pay App: ECF No. 36-1 at 87-88<br><br>Check: ECF No. 36-1 at 92 |
| | $456,142.71 | Pay App: ECF No. 36-1 at 87-88<br>Check: ECF No. 36-1 at 91 |
| | $164,377.05 | Pay App: ECF No. 36-1 at 302<br>Check: ECF No. 36-1 at 303<br>J&G Contractor Inc. |
| | $313,471.74 | Pay App: ECF No. 36-1 at 300<br>Check: ECF No. 36-1 at 301 |
| _Masonry_ Payments Made | $130,447.14 | Pay App: ECF No. 36-1 at 132- |

| | | 133 Check: ECF No. 36-1 at 137 |
|---|---|---|
| **TOTAL of Concrete and Masonry Damages: $5,667,222.33** | | |

Accordingly, it is recommended that Plaintiff be awarded compensatory damages in the amount of $5,667,222.33, which would place it "in the same position as if the loss had never occurred" given the disbursements it made to MDC which were never paid to lower tier subcontractors or the payments it was forced to make to these subcontractors because Delahunt failed to do so. *See CoActiv Capital Partners, Inc. v. Hudson Converting, Inc.,* No. 09-CV-01206 (LEK) (RFT), 2011 U.S. Dist. LEXIS 97795, at *4 (N.D.N.Y. Aug. 31, 2011).

## B. Punitive Damages

Although the undersigned has found that liability has been established on the underlying motion for default judgment and that compensatory damages should be awarded, punitive damages must still nevertheless be independently established. *See Burton v. City of New York*, 630 F. Supp. 3d 586, 600 (S.D.N.Y. 2022) (stating that punitive damages "may not be awarded without evidentiary proof"); *see also Asesoral Bus. Partners LLC v. Seatech Worldwide Corp*., No. 19-cv-11512 (AJN), 2021 U.S. Dist. LEXIS 45106, at *23 (S.D.N.Y. Mar. 10, 2021) (denying punitive damages on motion for default because Plaintiff failed to provide support establishing its entitlement to punitive damages). Here, Plaintiff seeks punitive damages in an amount equal to the compensatory damages—$5,667,222.33.

Under New York law, to obtain punitive damages in cases involving fraud stemming from contracts entered into by the parties, the claimant must plead: "(1) that defendant's conduct is actionable as an independent tort; (2) that the tortious conduct is of an egregious nature; (3) that the egregious conduct is directed to the plaintiff; and (4) that it is part of a pattern directed at the public generally." *Ventus Networks, LLC v. Answerthink, LLC*, No. 05-cv-10316 (DAB), 2007 U.S. Dist. LEXIS 13254, at *5 (S.D.N.Y. Feb. 22, 2007). However, where, as here, there is *no*

16

*contractual relationship* between the parties (*see* ECF No. 35 at 18) (stating that Defendant was not a party to the contract between Plaintiff and MDC), Plaintiff need not establish that Defendant's conduct amounted to a public wrong for its fraudulent inducement claim.  *See Plymouth Res., LLC v. Norse Energy Corp. USA,* No. 2010-cv-909 (NAM) (DEP), 2011 U.S. Dist. LEXIS 165573, at *16 (N.D.N.Y. Mar. 10, 2011) ("[W]here there is no contractual long-standing relationship between the parties, the plaintiff may recover punitive damages without establishing a public wrong.").  Further, on a tort claim, Plaintiff only needs to demonstrate that the defendant committed "gross, wanton or willful fraud or other morally culpable conduct." *Topps Co. v. Cadbury Stani S.A.I.C.*, 380 F. Supp. 2d 250, 264 (S.D.N.Y. 2005) (citing *Borkowski v. Borkowski,* 355 N.E.2d 287 (N.Y. 1976)).  Accordingly, courts are more likely to award punitive damages for tort claims that do not arise out of a contractual relationship, but must still be proven by clear and convincing evidence.  *Id.*; *Schlaifer Nance & Co. v. Estate of Warhol,* 927 F. Supp. 650, 664 (S.D.N.Y. 1996); *Greenbaum v. Svenska Handelsbanken*, 979 F. Supp. 973, 976-77, 980 n.2 (S.D.N.Y. 1997) (citing cases stating that punitive damages requires a heightened standard when the underlying claim, such as fraud, raises the standard in the first instance).  Thus, awarding punitive damages is *not* automatic following a finding of liability on a fraud claim.

"While all fraud contains some elements of gross, wanton, or willful conduct, punitive damages should not be awarded in *every* case in which fraud is found."  *Sitariu v. Bains,* No. 18-CV-600 (MAD) (DJS), 2019 U.S. Dist. LEXIS 78121, at *10 (N.D.N.Y. May 9, 2019) (emphasis added).  Rather, to determine whether morally culpable conduct exists, courts look to "ordinary morals of the marketplace" and "whether the punishment is needed and will be effective as a deterrent."  *Id.*

In *Schlaifer Nance,* 927 F. Supp. at 665, the court cited several examples in which courts denied punitive damage awards despite defendant's knowingly false and material misrepresentations (*Accusystems, Inc. v. Honeywell Information Sys., Inc.,* 580 F. Supp. 474, 482 (S.D.N.Y. 1984)) and despite defendant's defrauding plaintiff into pledging thousands of stock shares defendant knew were worthless (*Key Bank of New York v. Diamond,* 611 N.Y.S.2d 382, 383 (N.Y. App. Div. 4th Dep't 1994)). The *Schlaifer Nance* court granted defendant's motion for judgment as a matter of law as to a finding of fraud and cited several reasons for denying punitive damages on the claim including: (i) the sophistication of the allegedly defrauded company; (ii) plaintiff's pursuing defendant to enter into the agreement; and (iii) the disclosures that defendant's representatives made which were inconsistent with an intent to defraud. *Schlaifer Nance,* 927 F. Supp. at 664-66.

Here, and similar to *Schlaifer*, which considered the sophistication of the company, Watt's testimony at the hearing revealed that Geis is a 55-year old company that specializes in general contracting work and routinely completes approximately $400 million dollars' worth of construction work annually. (January 4, 2024 Transcript at 3.) Plaintiff never cross-referenced the Flaherty letter to ensure that MDC was part of Edwards & Company's surety program because it never had a reason to investigate such letters in the past. (May 1, 2024 Transcript at 21-22) (Q: "That letter, did you ever take any efforts to verify the veracity of that letter?" A: "There would be no reason to….There was no reason for me to believe it was a fraudulent document.") Although Watts provided credible testimony that it was not the standard practice to verify such bond availability letters, Plaintiff's checking could have brought the issues set forth herein to its attention much sooner. (*Id.* at 47) ("The hindsight being what it is, you know, yeah,

it would have been great [to verify the contents of the letter], but, you know, that's hindsight, right, so.").

In the December 2, 2021 R&R, the undersigned already noted at length that Defendant fraudulently induced Plaintiff to enter into the contracts with MDC by relying on the Flaherty letter and the eight lien waivers. (ECF No. 19 at 7-8.) However, at the hearing, Watts testified on cross-examination that work on behalf of MDC was still getting done and problems did not seem to arise until after six months into the construction project. (May 1, 2024 Transcript at 27) (Q: "And whatever had to be done was actually getting done, correct?" A: "Yes.") Watts also acknowledged that it was possible that Delahunt needed to be reimbursed in some manner for the costly materials used for the construction projects. (*Id.*) In fact, Watts even conceded that he did not know how much the materials used costed and he did not know whether Delahunt used the monies to reimburse himself due to change orders issued throughout the course of the project. (*Id.* at 37.)

Further, the cases in which courts awarded punitive damages differ from the facts here. For example, in *Atsushi Mori v. Mamoru Saito*, No. 10-cv-6465 (KBF), 2014 U.S. Dist. LEXIS 106007, at *6-7 (S.D.N.Y. Aug. 1, 2014), the court found that plaintiff engaged in a "wide-ranging and willful fraud" targeting "unsophisticated investors, often elderly or disabled" which deprived them of their life savings. And in *CoActiv Capital Partners, Inc. v. Hudson Converting, Inc.,* No. 09-CV-01206 (LEK) (RFT), 2011 U.S. Dist. LEXIS 97795, at *5-6 (N.D.N.Y. Aug. 31, 2011), the court looked to the defendants' guilty plea in which defendants stated they "deceived over eighty-five (85) lenders…to illegally obtain approximately $213,000."

Unlike *Atsushi* and *CoActiv*, the conduct here does not involve the same moral culpability. Defendant deprived a handful of companies—not nearly one hundred elderly or

disabled investors—of their earned monies. As discussed above, the Court cannot simply take the allegations in the Complaint at face value; instead damages must be awarded on independent proof. Here, it does not appear that Defendant's conduct was "morally culpable" given the proof in the record and the reasons provided by Defendant at the hearing. *See Perico, Ltd. v. Ice Cream Industries, Inc.,* No. 87-cv-4211 (MBM), 1990 U.S. Dist. LEXIS 1413, at *5 (S.D.N.Y. Feb. 9, 1990) (denying punitive damages award on plaintiff's fraud claim where, at the damages inquest, plaintiff failed to adduce evidence demonstrating defendant's high moral culpability or wanton and malicious conduct to award punitive damages).[8]

Notably, Plaintiff cites several cases for the proposition that courts in this Circuit routinely award punitive damages when entities engage in similar tortious conduct. (ECF No. 48 at 16.) However, none of those cases involve non-contractual relationships between the parties like the present situation and otherwise involve dissimilar facts. *See Langenberg v. Sofair,* No. 03-cv-8339 (KMK) (FM), 2006 U.S. Dist. LEXIS 88157, at 12-14 (S.D.N.Y. Dec. 7, 2006) (defendant-investment advisor was indicted after making "numerous false statements in filings with the Securities and Exchange Commission and Landway promotional materials" which stemmed from both contract and tort law concepts and his conduct was "sufficient to establish a public wrong"); *Jamieson v. Sec. Am., Inc.,* No. 19-cv-1817 (VB) (JCM), 2022 U.S. Dist. LEXIS

---

[8] Even if the District Judge were to find that punitive damages should be awarded, "punitive damages should be awarded only when necessary to achieve punishment or deterrence." *Martinez v. Accelerant Media, LLC,* No. 20-CV-9366 (GBD) (OTW), 2024 U.S. Dist. LEXIS 10232, at *14 (S.D.N.Y. Jan. 19, 2024), Further, if the award for compensatory damages is "particularly substantial," the deterrent effect is typically reduced or even eliminated. *Id.*, *report and recommendation adopted,* 2024 U.S. Dist. LEXIS 60707 (Mar. 26, 2024) (awarding compensatory damages over $600,000 and recommending that since those damages were substantial, no punitive damages should be awarded). Here, Plaintiff would already be receiving over $5 million in compensatory damages; awarding punitive damages to Plaintiff would not act as further punishment or a greater deterrence for Defendant. This is in addition to Plaintiff's judgment against the entity on the breach of contract claims.

80170 (S.D.N.Y. Feb. 22, 2022) (awarding punitive damages where defendant-investment advisor devised a scheme to wire monies to his own accounts over more than 20 years, which robbed plaintiffs of their retirement savings); *Cont'l Indus. Grp. v. Altunkilic*, No. 14-CV-790 (AT) (JLC), 2020 U.S. Dist. LEXIS 116763 (S.D.N.Y. July 1, 2020) (providing punitive damages where defendant stole proprietary information from plaintiff "to solicit its suppliers and customers" and orchestrated a five-year scheme to compete with plaintiff).

Consequently, for these reasons, Plaintiff has not met its burden and its request for punitive damages should be denied.[9]

### C. Pre- and Post-Judgment Interest

Plaintiff also seeks pre-judgment interest from February 28, 2020[10]—the date that the notice of default was sent to Defendant (*see* Exhibit D1)—through the date of final judgment, as well as post-judgment interest thereafter if it is not paid.  (ECF No. 36 at 12; ECF No. 48.)

"[I]t is well settled that state law applies to the question of whether to award prejudgment interest in a diversity action in federal court."  *Foresco Co. v. Oh*, 337 F. Supp. 3d 304, 306 (S.D.N.Y. 2018).  Under New York Law, Plaintiff is entitled to pre-judgment interest on the damages from the time of the misconduct, at a rate of  nine percent per annum.  *See* N.Y. C.P.L.R. §§ 5001, 5004.

Pre-judgment interest must be computed from either (1) the date of the incident or, if multiple occasions of breach make impossible the determination of a single date, (2) a reasonable

---

[9] Defendant states a contractual relationship exists between the parties since the fraud arises out of the contract between Geis and MDC—this is wrong.  (ECF No. 49 at 10.)  However, even if the Court were to find there was a contractual relationship, the conduct alleged would fail to establish a public harm for the reasons stated above—namely, the fraud was not widespread and not as morally egregious as was found in other cases.

[10] (*See* ECF No. 42) (stating that Plaintiff would be requesting the start date of any prejudgment interest be moved from June 14, 2019 to February 28, 2020).

intermediate date decided by the Court.  *See* N.Y. C.P.L.R. § 5001 ("Interest shall be computed from the earliest ascertainable date the cause of action existed . . . . Where such damages were incurred at various times, interest shall be computed upon each item . . . or upon all of the damages from a single reasonable intermediate date.").  "[C]ourts have 'wide discretion in determining a reasonable date from which to award pre-judgment interest.'"  *Santillan v. Henao*, 822 F. Supp. 2d 284, 298 (E.D.N.Y. 2011) (quoting *Conway v. Icahn & Co*., 16 F.3d 504, 512 (2d Cir. 1994)).  Plaintiff here is entitled to prejudgment interest given Defendant's fraudulent conduct.  *See Allgaier v. Peterson*, No. 13-CV-5112 (VB) (LMS), 2019 U.S. Dist. LEXIS 137612, at *21 (S.D.N.Y. Aug. 13, 2019) (recommending that the court award pre-judgment interest at the nine percent statutory rate for plaintiff's claims of fraud and other causes of action).

Therefore, the undersigned respectfully recommends that Plaintiff's request for pre-judgment interest be granted at the statutory rate of nine percent per annum, starting from February 28, 2020—the date Plaintiff indicated that the prejudgment interest should begin—until the date judgment is entered in this case.  (ECF No. 36-1 at 2); *see Ultra Coachbuilders, Inc. v. Gen. Sec. Ins. Co*., 229 F. Supp. 2d 284, 288 (S.D.N.Y. 2002) (granting pre-judgment interest from the date of each invoice).

Plaintiff also requests post-judgment interest, which is to accrue from the date the judgment is entered until it is paid.  (ECF No. 36-1 at 2.)  "Pursuant to 28 U.S.C. § 1961, post-judgment interest is calculated from the date of entry of judgment at a rate equal to the weekly average one-year constant maturity Treasury yield, to be computed by the clerk of the court." *Wells Fargo Bank, N.A. v. Nat'l Gasoline, Inc*., No. 10-CV-1762 (RER), 2013 U.S. Dist. LEXIS 6668, at *24 (E.D.N.Y. Jan. 16, 2013).  "The Second Circuit has consistently held that an award

of post-judgment interest at the statutory rate is 'mandatory.'" *Apex Emple. Wellness Servs. v. APS Healthcare Bethesda, Inc*., No. 11-CV-91718 (ER), 2017 U.S. Dist. LEXIS 14254, at *35-36 (S.D.N.Y. Feb. 1, 2017).  Because the post-judgment interest is mandatory, the undersigned recommends granting Plaintiff's request for the post-judgment interest, with the amount to be determined at a later time.  *See Sec'y of the United States HUD v. Rhodie*, No. 21-CV-3165 (KAM), 2022 WL 3213048, at *5 (E.D.N.Y. Aug. 9, 2022) (granting post-judgment interest since pursuant to 28 U.S.C. § 1961, "[t]he award of post-judgment interest is mandatory on awards in civil cases as of the date judgment is entered." (citing *Tru-Art Sign Co. v. Local 137 Sheet Metal Workers Int'l Ass'n*, 852 F.3d 217, 223 (2d Cir. 2017)); *see also United States v. Spiegel*, No. 19-CV-5456 (JS) (AYS), 2022 WL 5114462, at *4 (E.D.N.Y. Sept. 30, 2022) (granting request for pre-judgment interest).

The Court respectfully recommends granting Plaintiff's request for both pre- and post-judgment accruing at the appropriate statutory rates.  Should this R&R be adopted, the undersigned defers to the Clerk of the Court as to the calculation of the post-judgment interest.

**D. Costs**

A party can typically recover "[c]osts relating to filing fees, process servers, postage, and photocopying[.]" *Feltzin v. Union Mall LLC*, 393 F.Supp.3d 204, 219-20 (E.D.N.Y. 2019) (internal quotation marks omitted).  A request for costs must be supported by adequate documentation.  *Id*. (collecting cases requiring appropriate documentation or receipts for costs). "[T]he party moving for costs bears the burden of demonstrating the reasonableness of each charge; failure to provide adequate documentation of costs incurred will limit, or even defeat, recovery." *Id*. (internal quotation marks omitted).  However, certain costs, such as filings fees, "are recoverable without supporting documentation if verified by the docket." *Id*.  "[T]he

decision of whether to award costs . . . 'is committed to the sound discretion of the district court.'" *Swiatkowski v. Citibank as Citigroup*, 745 F. Supp. 2d 150, 174 (E.D.N.Y. 2010) (quoting *Cosgrove v. Sears, Roebuck, Co*., 191 F.3d 98, 102 (2d Cir. 1999).

Plaintiff requests $300 in related costs for filings and service-related costs imposed on it to prosecute this action.  (ECF No. 36 at 13.)  Plaintiff has submitted adequate documentation and the record is abundantly clear that Plaintiff spent $300 in *pro hac vice* filing fees.  (*See* ECF Nos. 6-7.)  For these reasons, the Court recommends granting Plaintiff's request for $300 in costs.

## CONCLUSION

Accordingly, for the foregoing reasons, it is recommended that the Plaintiff's motion is hereby GRANTED subject to the above and the following deductions:

| *Category of Damages* | **Amount Awarded Per Category** |
|---|---|
| *Compensatory Damages* | <ul><li>Concrete Damages:<ul><li>$303,029.10</li><li>$553,492.80</li><li>$566,262.94</li><li>$553,071.90</li><li>$136,727.87</li><li>$270,357.61</li><li>$517,953.26</li><li>$575,645.58</li><li>$303,350.02</li><li>$208,447.29</li><li>$7,345.86</li><li>$36,012.98</li><li>$346,086.48</li><li>$225,000</li><li>$456,142.71</li><li>$164,377.05</li><li>$313,471.74</li></ul></li><li>Masonry damages: $130,447.14</li></ul>**TOTAL**: $ 5,667,222.33 |

| | |
|---|---|
| *Punitive Damages* | DENIED |
| *Pre-Judgment Interest* | A rate of nine percent per annum on the awarded compensatory damages, to be calculated from February 28, 2020 through the date of final judgment |
| *Post-Judgment Interest* | To be determined by the Clerk of the Court |
| *Costs* | $300 |
| **TOTAL: $ 5,667,522.33** | |

## OBJECTIONS

A copy of this Report and Recommendation is being electronically served on Defendant's counsel.  Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report.  28 U.S.C. § 636(b)(1) (2006 & Supp. V 2011); Fed. R. Civ. P. 6(a), 72(b).  Any requests for an extension of time for filing objections must be directed to the district judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections.  Failure to file objections within fourteen (14) days will preclude further review of this Report and Recommendation either by the District Court or the Court of Appeals.  *Thomas v. Arn*, 474 U.S. 140, 145 (1985) ("a party shall file objections with the district court or else waive right to appeal"); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) ("failure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision"); *see Monroe v. Hyundai of Manhattan & Westchester*, 372 F. App'x 147, 147–48 (2d Cir. 2010) (same).

Dated:      Central Islip, New York, June 12, 2024

RESPECTFULLY RECOMMENDED,

/S/ *James M. Wicks*

     JAMES M. WICKS
United States Magistrate Judge

25